# In the United States Court of Federal Claims

No. 16-1157C
(Filed: December 17, 2019)

| | |
|---|---|
| PANTHER BRANDS, LLC, and PANTHER RACING, LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE UNITED STATES OF AMERICA,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Keywords: Implied-in-Fact Contract; Breach of Contract; Mutual Assent; Unambiguous Offer and Acceptance; Consideration; Implied Actual Authority; Ratification; Equitable Estoppel; Army National Guard; Sponsorship; Subcontractor |

*James R. Fisher* and *Debra H. Miller*, Miller & Fisher, LLC, Indianapolis, IN, for Plaintiffs.

*Michael D. Austin*, Trial Attorney, Commercial Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this case, which is before the Court on the government's motion for summary judgment, Plaintiffs, Panther Brands, LLC and Panther Racing, LLC (collectively "Panther"), allege that the Army National Guard ("the National Guard" or "the Guard") breached implied-in-fact contracts under which: 1) the Guard agreed to sponsor Panther's race team in the IndyCar Series for an additional option year in exchange for Panther's promotion of the Guard through advertising and marketing; and 2) Panther agreed to implement an expanded version of its "Boss Lift" program which provided the Guard with certain services designed to encourage the recruitment and retention of Guardsmen. In this action, Panther seeks to recover the costs it incurred to perform on the alleged contracts, based on what it characterizes as the government's termination of the agreements for convenience.

The government has moved for summary judgment contending, among other things, that the elements of an implied-in-fact contract cannot be established. For the reasons set forth below, the government's motion for summary judgment is **GRANTED** as to both claims.

# BACKGROUND[1]

## I.      Written Agreements

Plaintiff Panther Brands, LLC, provides marketing and brand management services to Panther Racing, LLC. Def.'s Mot. for Summ. J. App. ("Def.'s App.") at 48, ECF No. 53-1. Panther Racing, in turn, is "involved in competitive racing, including the development, maintenance and operation of a racing team" for participation in the IndyCar series. Id. Beginning in 2008 and up through the events giving rise to this action, the Guard annually sponsored Panther racing teams in the IndyCar Series to advertise and market itself. Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. App. ("Pls.' App.") at 1, Aff. of John Barnes ("Barnes Aff.") ¶ 3, ECF No. 54-1; Pls.' App. at 12 (GAO decision).

On September 24, 2012, the Guard issued a task order to Laughlin, Marinaccio & Owens, Inc. ("LM&O"), an advertising company with which it held an IDIQ contract for advertising services. Def.'s App. at 1; Pls.' App. at 181–82, Dep. of Maj. Ellieth Rodrigez ("Rodriguez Dep.") at 37:10–38:5. Under the task order, LM&O was to "provide professional, administrative, and technical services plus equipment and materials for the development of the IRL program and its objectives." Def.'s App. at 6. Those objectives, according to the task order, were to "recruit new soldiers, retain current membership, and brand the [Army National Guard] throughout the IRL fan base during the 2013 season." Id. The Statement of Work for the task order provided that "the contractor [LM&O] shall find a driver and team within the IRL." Id. at 8. It further stated that "[f]inal approval of the contractor's selections will be approved by the Contracting Officer [] with technical input from the Contracting Officer's Representative." Id. The term of the task order was one year but the order could be extended by the government "for up to two [] option years." Id. at 38.

In October 2012, Document and Packaging Brokers, Inc. ("Docupak"), acting as subcontractor to LM&O, entered a sponsorship agreement with Panther Brands, LLC. Its term extended from the date of signing to the final race of the 2013 series, with the proviso that "[t]he Parties [i.e., Panther Brands and Docupak] may extend this Agreement for an additional one (1) year term . . . by mutual consent in writing prior to 5:00 p.m. E.D.T. on July 31, 2013." Id. at 49.

The sponsorship agreement provided that Panther Brands would supply the car, driver, uniforms, personnel and equipment, and enter a team in the IndyCar series races. Id. at 49–50. The car and uniforms would be branded with the Guard's marks and Panther would provide advertising and other services to promote the Guard. Id. In exchange for these and related services, Panther Brands would be paid $12.8 million for the initial term and at least another $12.8 million if the agreement was renewed. Id. at 53.

---

[1] The facts in this section are based on the parties' pleadings and the exhibits submitted in connection with the government's motion for summary judgment. Unless specifically noted, the facts set forth are not in dispute.

## II.    Practice in Prior Years

As noted above, the Guard had been sponsoring Panther Racing teams since 2008. According to Panther's CEO, John Barnes, in the years leading up to the matters at issue in this litigation, Panther had routinely begun its preparations for the next racing season before there was a written sponsorship agreement in place, usually in October. Barnes Aff. ¶ 4.[2] Mr. Barnes states that "[i]t was standard custom, practice, and policy . . . for the Guard to give Panther a verbal notice of its intent to exercise the annual renewal option of the sponsorship contract, as soon as the renewal was approved by the Guard." Id. ¶ 5. Mr. Barnes alleges that "Panther was told it could rely upon this verbal notice of intent to exercise the sponsorship renewal option of the Panther sponsorship contract to make commitments and preparations for the next racing season." Id.; see also Pls.' App. at 10, Aff. of MG Tod Bunting ("Bunting Aff.") ¶ 12 (stating that he was "aware at all relevant times that it was the custom and practice for Panther to be orally authorized to proceed to prepare for the next racing season based upon a verbal confirmation from The Guard of its exercise of its contractual sponsorship renewal option").

In a sworn statement, Maj. Ellieth Rodriguez, the contracting officer ("CO") responsible for the Recruiting and Retention Division from 2012 to 2014, stated that her relationship was with the prime contractor, LM&O, and not with Panther. Pls.' App. at 63 (sworn statement of Maj. Ellieth Rodriguez). She stated that she had no knowledge that Division officials had told Panther to proceed in the past before a contract was executed, but that she would not be surprised if that had occurred because "contracting was always behind on contracts, so the culture was once the RA decided on [a] project they would just do it assuming the contract would eventually get done." Id. at 64. "[T]he Division just knew that [they] had a lot of money," she observed, "and they would make relations with vendors and let the contracting process catch up when it could." Id.

## III.   Communications Between the Guard and Panther Regarding the Upcoming 2014 Racing Season

### A.    January 30, 2013 Meeting

Notwithstanding that the Guard's contractual arrangement was with LM&O and not Panther, it was apparently routine for Panther to communicate directly with Guard officials, both with respect to its sponsorship agreement and with respect to a separate set of services that Panther had been providing to the Guard pursuant to its "Boss Lift program." See, e.g., Pls.' App. at 208, Dep. of LTC Michael Wegner at 79:14–21. Under that program, Panther provided

---

[2] In its complaint, Panther alleges that the practice of signing the sponsorship agreements in late September or October of the previous year created practical problems because "[t]he development of racing technologies and the infrastructure needed to operate a full time IndyCar program required the race teams to begin preparing for each season by no later than June of the preceding year." Compl. ¶ 21, ECF No. 1. "Without a commitment from [the Guard] for the next year's sponsorship by mid-season," Panther asserts, it "would be unable to enter into contracts, fund research and development of technology, hire a driver, and make other expenditures necessary to field a competitive team and car the following year." Id. ¶ 22.

job-focused initiatives designed to encourage employers to hire Guardsmen as a means of enhancing their recruitment and retention. At least as early as fiscal year 2011, the program appears to have been funded through modifications to the task orders between the Guard and Docupak. Pls.' App. at 48. From 2012, the Boss Lift program was funded through modifications to the task order between the Guard and LM&O. Id. at 51–54.

On January 30, 2013, Panther CEO John Barnes attended a meeting held at Docupak's offices, which was also attended by, among other Guard officials, Sgt. Tyrone Kosa. See Pls.' App. at 77 (identified as "meeting with Kosa, Amanda, Michael, Brad and Nic at Docupak"). Sgt. Kosa then served as the contracting officer representative ("COR") for the contract between the Guard and LM&O. Pls.' App. at 6, Aff. of Sgt. Tyrone Kosa ("Kosa Aff.") ¶¶ 4–5; Pls.' App. at 128 (delegation memorandum). During that meeting, according to Mr. Barnes, he was told that "the Guard wanted Panther to focus its [job programs] efforts on 'retention.'" Id. ¶ 11; see also Pls.' App. at 77 (note reflecting that "NGB wants to increase attention on retention over recruiting"). Mr. Barnes asserts that "Panther's jobs programs were highly valued by The Guard for their positive effect upon Guard retention," and that "The Guard urged Panther to find additional ways of expanding existing Panther programs and creating additional job-focused retention programs for The Guard." Barnes Aff. ¶ 11. The notes of the meeting reflect that Sgt. Kosa understood that the Guard's "evolving need," presumably to increase attention to retention of Guardsmen, could be addressed through the "adaptability of the Boss Lift platform." Pls.' App. at 77.

### B.    February 4, 2013 Meeting

Several days later, on February 4, 2013, Mr. Barnes and Major General ("MG") Tod Bunting met with Lieutenant General ("LTG") William Ingram in Washington, D.C. Barnes Aff. ¶ 6; Bunting Aff. ¶ 4. LTG Ingram was then the Director of the Army National Guard. Barnes Aff. ¶ 7. MG Bunting had been an Adjutant General at the Kansas National Guard from February 2004 until his retirement in January 2011. Bunting Aff. ¶¶ 2–3. He apparently had no formal employment or other relationship with Panther; instead, he has described himself as "just a passionate advocate of the team." Pls.' App. at 108 (July 22, 2013 email from MG Bunting to LTG Ingram).[3]

Mr. Barnes states in his affidavit that during the February 4 meeting "LTG Ingram told [him] that The Guard's sponsorship of Panther for 2014 was authorized, that the 2014 sponsorship of Panther had already been fully funded as the exclusive major sponsor, and that Panther should not seek other major sponsors." Barnes Aff. ¶ 8.[4] MG Bunting adds that during

---

[3] In an email among Guard personnel, he is described as "helping John Barnes (Panther Racing) coordinate [Employer Support of the Guard and Reserve] events/'Boss Lifts' for employers of National Guard members." Pls.' App. at 103 (February 8, 2013 email from Louis Cabrera to William Stoppel).

[4] According to Mr. Barnes, "[i]n prior years, The Guard had discouraged Panther from having additional sponsors, expressing its concern that the Guard could be seen as endorsing those additional sponsors." Barnes Aff. ¶ 9.

the meeting, the three discussed "support of Panther's programs," and that "LTG Ingram assured Barnes that Panther was meeting The Guard's needs, and told him 'keep doing what you are doing.'" Bunting Aff. ¶¶ 6, 7. MG Bunting asserts that LTG Ingram also told them that "Panther was 'good to go' for 2014" and that "the 2014 sponsorship had already been fully funded and sent forward to OSD as part of their overall FY14 program." Id. ¶ 8. He further states that LTG Ingram advised that "[t]he Guard was to remain Panther's exclusive major sponsor in 2014," although LTG Ingram "could not yet speak to 2015 and beyond." Id. For his part, LTG Ingram had no substantive recollection of this meeting as of 2015, when the matter was before GAO on Panther's bid protest, or more recently as of the date of his deposition. Pls.' App. at 226, Dep. of LTG William Ingram, Jr. at 54:8–55:8.

Lt. Col. ("LTC") Mark Boettcher, the Chief of Army National Guard Recruiting, reported directly to LTG Ingram. Pls.' App. at 231, Dep. of LTC Mark Boettcher ("Boettcher Dep.") at 8:4–7; id. at 13:14–16. He explained that each year (in the spring) he and his counterparts in charge of recruiting for the active Army and the Army reserves would meet with the budget personnel at the Pentagon to offer their proposals regarding their budgets for the upcoming year. Id. at 14:1–12. A few months later, he testified, the Pentagon would advise them of the amount of their budget for the next fiscal year. Id. at 14:17–18. With those numbers in hand, LTC Boettcher testified, "we would sit down . . . as a team with my marketing and advertising experts," and "make a recommendation." Id. at 15:2–7. They would then provide LTG Ingram with a briefing and seek his approval for their proposals regarding the expenditure of the funds they had advised would be made available by the Pentagon. Id. at 15:17–16:17. LTG Ingram would give his guidance regarding which projects he approved and then, LTC Boettcher stated, "we would . . . meet with contracting to make sure that . . . it was allocated in accordance with proper procedure." Id. at 16:13–17.

## C.     February 13 Call

According to MG Bunting, on February 13, 2013, he received a call from LTC Michael Wegner. Bunting Aff. ¶ 10. LTC Wegner was then the Chief of the Guard's Marketing Branch. Boettcher Dep. at 8:14–19. He reported to LTC Boettcher, id., who, as noted, reported in turn to LTG Ingram. MG Bunting alleges that LTC Wegner advised him that "going forward, all communications to or from the Guard about the IndyCar program were to be with Sgt. Tyrone Kosa." Bunting Aff. ¶ 10. LTC Wegner further stated that Sgt. Kosa "had full authority to represent the Guard in its communications with Panther regarding the sponsorship," and he so advised Mr. Barnes. Id. ¶ 11.

Sgt. Kosa's authority and responsibilities as the COR were set forth in a delegation memorandum from the CO dated September 14, 2012. Pls.' App. at 128. Per that memorandum, the COR was given the authority to "[i]nspect and monitor contractor performance to ensure technical proficiency and compliance with the terms of the contract[,]" to "[n]otify the contractor of deficiencies observed during surveillance and direct appropriate action to effect correction[,]" and to "[m]aintain continuous liaison and make recommendations to the Contracting Officer on technical matters." Id. The memorandum expressly states, however, that the COR "was not authorized to award, agree to, or sign any contract modification[], or in any way obligate the payment of money by the Government." Id. at 129.

According to Sgt. Kosa, it was his responsibility "to inform Docupak, and Panther[], of all operational decisions made by the National Guard concerning [the IRL program] . . . [and] to communicate to Panther[] when the National Guard had authorized Panther to begin preparation for future racing seasons before the expiration of the current season." Kosa Aff. ¶ 5.

### D.   February 25 Call

In his affidavit, Sgt. Kosa states that on or before February 25, 2013, LTC Boettcher told him "that the Panther IndyCar sponsorship contract was being renewed for 2014." Id. ¶ 7. Sgt. Kosa then told Mr. Barnes that he "had been authorized by the National Guard to advise him that the National Guard IndyCar contract with Panther was being renewed for 2014, and that he should start preparing for the 2014 season." Id. ¶ 8; see also Barnes Aff. ¶ 13 (stating that on February 25, 2013 Sgt. Kosa informed Mr. Barnes that "the National Guard had exercised its 2014 renewal option for IndyCar sponsorship of Panther, and that Panther could start preparing for the 2014 season").

According to Sgt. Kosa "[i]t was standard custom, practice, and policy to orally advise the team being sponsored of the renewal of contracts as soon as that determination was made." Kosa Aff. ¶ 10. Further, upon receiving authorization for renewal, "the next step," according to Sgt. Kosa, was to prepare a statement of work for the Contracting Division to incorporate into the written agreement. Id. ¶ 11. Sgt. Kosa states in his affidavit that did so before he left the division on May 12, 2013. Id. ¶ 12.

## III.   Panther Actions After February 25 Call

In his affidavit, Mr. Barnes asserts that in reliance on the notification he received from Sgt. Kosa on February 25, "Panther incurred substantial costs and commitments to prepare for the 2014 season." Barnes Aff. ¶ 14. These included, among other things, obtaining a new technical advisor, additional research and development for the 2014 vehicle, and hiring a new driver. Id. In addition, according to Mr. Barnes, in reliance on the representations of LTG Ingram and Sgt. Kosa, Panther halted efforts to obtain alternative sponsors for the 2014 racing season. Id. ¶ 16.[5] Further, he states, "by the time Panther [was] informed that the Guard's 2014 sponsorship was going to another race team, it was too late to obtain sponsors for the 2014 racing season." Id. ¶ 18.

During his deposition, Mr. Barnes testified that he interpreted the February 25, 2013 call as also giving Panther the go ahead to prepare to implement an expansion of the Boss Lift program as had been discussed during the January 2013 meeting with Sgt. Kosa and others. Pls.' App. at 225, Dep. of John Barnes ("Barnes Dep.") at 306:22–307:17. According to Mr. Barnes, during the January meeting Panther was "requested by Sgt. Kosa to change our path from what our contract was with Docupak," and Panther "expected to be paid for those initiatives." Id. 171:3–6. The expanded jobs program "centered around [] bringing centers of influence and employers to [] race events and giving them the presentation that we did to increase retention of

---

[5] There are two paragraphs numbered "16" in this affidavit. Here, the Court cites the one found on page 5 of Panther's appendix.

current soldiers in the National Guard." Id. at 163:10–20. Such programs "centered around a different pathway of bringing . . . local C-level people to our race events, introducing them to the Guard leadership who were there . . . [and talking to them about] the importance of hiring Guardsmen." Id. at 165:10–18.

According to Mr. Barnes, after the February 25, 2013 call, Panther "lined up all the things to accomplish the jobs program." Id. at 307:6–7. These included, according to the allegations in the complaint, the implementation of a Medal of Honor and Fortune 500 CEO program to generate CEO support for additional hiring of Guardsmen (at a cost of $215,394.74); increased signage at the Indianapolis Motor Speedway to promote the Guard ($85,000); an increased hospitality footprint at each race beyond the amount set forth in the 2013 Sponsorship Agreement ($405,050.06); the purchase of an additional 100 tickets and credentials for each race ($156,061.56); the hiring of seven full-time Panther employees to work on the retention program ($768,268.08); the purchase of a contract with ABC and NBC to add-in car cameras in 2013 ($271,955); National Guard access to the Fan Zone for 2013 and 2014 ($1,170,000); and the cost and installation of a simulator car exhibit in the Fan Zone for each race ($72,845.50). Compl. ¶ 105.

Panther alleges in its complaint that these expenditures were all done "at the direct request and authorization of [the National Guard], with knowledge and authorization of the Contracting Officer." Id. It offers no support for this allegation, however, in its response to the government's motion for summary judgment—and the testimony of the CO, Maj. Rodriguez, appears to refute it. She testified that she was only "[v]aguely" aware that Panther was incurring costs for job programs, Rodriguez Dep. at 197:4–8, and that she could "not say for sure" whether they were doing so, id. at 197:17–198:1. She stated that she knew of the programs as contracted by LM&O, but that "[t]he details—the specifics were handled . . . by the prime, by LM&O" and that she " contracted or spoke with or had any dealings with Panther per se" regarding the program. Id. at 198:6–8.

In a statement signed on May 18, 2015, Sgt. Kosa (who was then no longer serving as a CO representative), denied giving Panther the go-ahead for its expenditures in connection with an expanded jobs program. Pls.' App. at 69. He stated that "programs like the Medal of Honor were not specified in the contract." Id.[6] He further stated that [t]his was the company's decision to enhance their image that was on them" and that it was "hammered into [him] that you don't tell a company to go above and beyond." Id.

## IV.   Modification of LM&O Task Order to Add Funding for Boss Lift Program

In the meantime, in March of 2013, the Statement of Work for the task order to LM&O was amended to add the implementation of Panther's Boss Lift program with increased costs

---

[6] To be sure, the modified Statement of Work contemplated the appearance of Medal of Honor awardees at Boss Lift events "outside of the IndyCar schedule." Def.'s App. at 76. However, the Medal of Honor recipient program discussed in the complaint, and for which Panther seeks compensation under the alleged expanded jobs program, occurred at the 2013 Indianapolis 500 and "at all of the domestic races in 2013." Compl. ¶ 105.

estimated in excess of $700,000. <u>See</u> Pls.' App. at 44, 169. As described in the work statement, under the Boss Lift program, Panther was to plan events where employers could "experience what it is really like to be a Guardsman for a day" and provide Guardsmen the opportunity "to interact and interview directly with these employers for currently offered positions." <u>Id.</u> at 158. Under the modification, the contractor was required to submit a plan "to utilize the Boss Lift program and the IRL racing team to assist the [Guard] in accomplishing its retention initiatives" accompanied by event locations and dates, types of activities, the number of expected attendees, detailed travel plans, etc. <u>Id.</u> at 158–59. The Statement of Work as modified provided that the COR would approve all elements of the Boss Lift program plan prior to their execution. Def.'s App. at 86.

The modification of the prime contract to incorporate the Boss Lift program was officially approved on July 26, 2013. <u>Id.</u> at 78 (modification of prime contract signed by CO). The modification approved an increase in the total amount of the award to LM&O of some $742,000.

## V.    The Guard Selects Another Contractor for the 2014 Season

As noted above, the sponsorship agreement between Docupak and Panther provided that the parties could extend it for one year "by mutual consent in writing prior to 5:00 PM E.D.T. on July 31, 2013." <u>Id.</u> at 49. But notwithstanding the communications described above, the parties did not execute a document by July 31, 2013, or any time thereafter, expressing their mutual consent for an extension of the agreement. Instead, the Guard decided to explore the possibility of sponsoring another racing team for the 2014 season.

In August 2013, the Guard asked LM&O to submit a proposal for "professional, administrative, and technical services . . . to develop the Guard's IndyCar program to recruit new soldiers, retain current membership, and brand the Army National Guard throughout the IndyCar fan base during the 2014 season." Pls.' App. at 13. LM&O sent this request and an accompanying statement of work to Docupak, which drafted a solicitation for the National Guard and sent it to six racing teams. <u>Id.</u> On September 3, 2013, Docupak informed Panther that Panther needed to submit a proposal and bid to secure the 2014 sponsorship from the National Guard. Compl. ¶ 59. Upon receipt of the proposals (including Panther's), Docupak prepared a summary of the proposals for LM&O. Pls.'s App. at 13. LM&O used this information to submit its own proposal to the Guard. <u>Id.</u>

The CO reviewed this submission and selected Rahal Letterman Lanigan Racing ("RLL") for award. <u>Id.</u> at 15. RLL's proposed cost was well below Panther's. Panther was notified of RLL's selection on October 4, 2013. Compl. ¶ 62.[7] It then lodged a bid protest with GAO, which was rejected. Panther Brands, LLC, B-409073, 2014 WL 505266, at *3 (Comp. Gen. Jan. 17, 2014) (dismissing Panther's protest and finding that the National Guard did not violate any procurement laws or act unreasonably in approving sponsorship by RLL rather than Panther).

---

[7] The date, as it appears in the complaint, is October 4, 2014. This appears to be a typographical error.

## VI.     The Present Action

Panther filed its claim in this court on September 16, 2016. Compl. at 1. Count I of its complaint alleges a breach of an implied-in-fact contract for reimbursement of Panther's expenses in preparation for the 2014 racing season. Id. at 27–28. In Count II, Panther alleges a breach of an implied-in-fact contract to pay the costs of the expansion of its Boss Lift program. Id. at 28. In Count III, Panther alleges a breach of contract based on the CO's knowing acceptance of the benefits of Panther's work for the 2014 racing season and jobs programs. Id. at 29. Count IV alleges that the government is "estopped from denying that the [National Guard] representatives had authority to enter into the implied-in-fact contracts with Panther." Id. Finally, Count V asserts that the Guard's "silence and inaction ratified [its] commitment to pay for 2014 sponsorship contract preparations, and to pay for additional [National Guard] recruitment and retention programs." Id. at 30. Panther seeks $1,532,227.30 in damages for Panther Racing, LLC and $3,459,032.10 for Panther Brands, LLC, as well as interest. Id. at 30.

The government filed a motion to dismiss or, in the alternative, motion for summary judgment on January 10, 2017. ECF No. 10. Upon the Court's denial of the alternative motion for summary judgment, ECF No. 16, the government withdrew its motion to dismiss, ECF No. 18. The government filed an answer to the complaint on July 17, 2017, ECF No. 24, and the parties engaged in discovery in accordance with a Court-approved schedule shortly thereafter, ECF No. 31. After several extensions, the parties advised the Court that discovery had concluded on April 25, 2019. ECF No. 40.

The government filed its motion for summary judgment on August 13, 2019. See generally Def.'s Mot. In that motion, the government argues that Panther is unable to demonstrate that it entered into any implied-in-fact contracts with the National Guard and, thus, cannot point to any genuine issues of material fact that could be resolved at a trial. Id. at 1. Panther filed an opposition brief on September 10, 2019 and oral argument was held on the motion on November 25, 2019.

## DISCUSSION

## I.     Jurisdiction

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Subsection (a)(2) of § 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the Contract Disputes Act (the "CDA"), 41 U.S.C. §§ 7101–09—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2).

The CDA sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010). In particular, it states that a contractor may bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3). Thus, the Federal Circuit has held that for the Court of Federal Claims to possess jurisdiction, the contractor must have first submitted a valid claim to the CO and received the CO's final decision on that claim. M. Maropakis Carpentry, 609 F.3d at 1327–28; see also Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; [it] was not designed to serve as an alternative administrative remedy, available at the contractor's option."). Further, "[f]ailure by a contracting officer to issue a decision on a claim . . . is deemed to be a decision by the contracting officer denying the claim." 41 U.S.C. § 7103(f)(5).

Here, the government does not contest that Panther submitted valid claims to the CO alleging the same breaches of implied-in-fact contracts that it brings before the Court and that the CO denied those claims. Accordingly, the Court has jurisdiction over this action under 28 U.S.C. § 1491(a)(2).

## II.     Summary Judgment Standards

Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Andersen, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Andersen, 477 U.S. at 255. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). It "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325).

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Andersen, 477 U.S. at 248). To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted).

Nonetheless, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Co-op, 16 F.3d at 1202.

III.     **Alleged Implied-in-Fact Contract Regarding 2014 Sponsorship**

"An implied-in-fact contract is one founded upon a meeting of minds and is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Turping v. United States, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003)). An implied-in-fact contract must meet the same requirements as an express contract. Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed Cir. 1997). These include: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380–81 (Fed. Cir. 2019) (quoting Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003)).

Panther argues that the Guard breached an implied-in-fact contract regarding the Guard's sponsorship of Panther's racing team for the 2014 season, but its characterization of the terms of this alleged agreement has been inconsistent. In its complaint, Panther alleged that, under the implied-in-fact contract, the Guard agreed to reimburse Panther for expenses incurred for any pre-2014 race season preparatory work. Compl. ¶ 116. In its opposition to the government's motion for summary judgment, on the other hand, Panther alleges that the Guard—presumably through LTG Ingram and Sgt. Kosa—"oral[ly] exercise[d] . . . a one-year extension, through the 2014 racing season, of a written 2013 Racing Season Sponsorship contract by which the Army National Guard [] sponsored Panther's race team in the IndyCar racing series." Pls.' Resp. at 4. It observes that "the 2013 sponsorship contract that was orally extended for 2014 specified each party's performance and financial obligation during any renewal term," and, therefore, presumably supplied the necessary lack of ambiguity in offer and acceptance required to establish the existence of a contract. Id. at 8.

A.     <u>**Existence of An Express Agreement**</u>

The government argues that Panther is precluded from bringing an implied-in-fact contract claim against the Guard by virtue of the well-settled principle "that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." Seh Ahn Lee v. United States, 895 F.3d 1363, 1370 (Fed. Cir. 2018). This preclusion principle applies, according to the government, because both the sponsorship agreement between Panther and Docupak, and the alleged implied-in-fact agreement between Panther and the Guard, cover the same subject, i.e., the Guard's sponsorship of a race team for the 2014 season. Further, the sponsorship agreement specifies the means by which it may be renewed—i.e., by mutual consent in writing no later than July 31, 2013.

The Court is not persuaded by this argument. The preclusion principle upon which the government relies is grounded at least in part in the rule prohibiting the use of parol evidence to modify the terms of an express contract. The principle therefore pre-supposes that the express contract is between the same parties as the alleged implied-in-fact contract. See Algonac Mfg. Co. v. United States, 428 F.2d 1241, 1255 (Ct. Cl. 1970) ("[A]s a general rule there can be no implied contract where there is an express contract <u>between the parties</u> covering the same subject.") (emphasis supplied). Indeed, the government has not cited any case in which the

principle was applied where, as here, the express contract did not bind both of the parties who were alleged to have also entered an implied-in-fact contract.[8]

**B.**     **Authority**

Summary judgment as to Count I is nonetheless appropriate because Panther has failed to supply evidence that the Guard officials whom it alleges extended its sponsorship agreement had the actual authority to bind the government in contract. Indeed, the undisputed evidence of record shows that they did not.

**1.**     **Actual Authority**

A government official has "express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." Jumah v. United States, 90 Fed. Cl. 603, 612 (2009), aff'd, 385 F. App'x 987 (Fed. Cir. 2010); see also Villars v. United States, 126 Fed. Cl. 626, 633 (2016) (same). Here, none of the Guard officials with whom Panther dealt had express contracting authority. As CO Maj. Rodriguez testified, contracting authority at the Guard was vested in the "Deputy Assistant Secretary of the Army for Procurement" or the "DASA(P)." Rodriguez Dep. at 31:3–14. She further explained that the Deputy Assistant Secretary delegated his authority to the Chief of the Army National Guard, who in turn delegated that authority to the Principal Assistant Responsible for Contracting ("PARC"). Id. at 32:1–33:4. The PARC then delegated contracting authority to the CO. Id. at 33:5–7. Therefore, as Maj. Rodriguez confirmed, the Director of the Army National Guard (i.e., LTG Ingram) did not have express contracting authority. Id. at 32:15–22. Nor did Sgt. Kosa, the COR.

Panther claims that as COR, Sgt. Kosa nonetheless had implied actual authority to bind the government in contract as an integral part of his assigned duties. See Pls.' Resp. at 14, 25–26; Liberty Ammunition, 835 F.3d at 1402 (quoting H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989)) ("An employee of the Government has implied actual authority to enter an agreement only when that authority is an 'integral part of the duties assigned to [the] government employee."). But "the doctrine of implied actual authority cannot be used to create an agent's actual authority to bind the government in contract when the agency's internal procedures specifically preclude that agent from exercising such authority." Cruz-Pagan v. United States, 35 Fed. Cl. 59, 62 (1996). That is the case here because, as described above, the delegation of authority to the COR expressly stated, among other things, that the COR was "not authorized to award, agree to, or sign any contract or modification thereto, or in any way obligate the payment of money by the Government." Pls.' App. at 129 (emphasis supplied); see also

---

[8] The Court has itself found one such case that was not selected for publication. See Ground Improvement Techniques, Inc. v. United States, 618 F. App'x 1020, 1030 (Fed. Cir. 2015) (suggesting, in passing and without extended analysis, that there could be no implied-in-fact contract in light of an express agreement involving another party). Notwithstanding the passing conclusion made in Ground Improvement, the Court finds no implied-in-fact agreement was formed here, as discussed below.

Rodriguez Dep. at 68:4–7 (noting that the COR was "prohibited from negotiating or discussing contract terms").

In Count IV of its complaint, Panther alleges that "[t]he doctrine of equitable estoppel bars the government from now asserting as an affirmative defense that the individual that the Guard had represented [] to be its sole authorized representative [presumably Sgt. Kosa], in fact lacked that authority." Id. 28–29. But as the Supreme Court has explained, "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). It is therefore well established that "the Government is not estopped to deny the limitations on [an agent's] authority, even though [a] private contractor may have relied on [] apparent authority to his detriment." Arakaki v. United States, 62 Fed. Cl. 244, 262 (2004); see also Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1401 (Fed. Cir. 2016) (observing that "apparent authority"—"which exists when an agent with no actual authority holds himself to have such authority to another's detriment"—is insufficient to bind the government).

Any claim that LTG Ingram had actual authority to bind the Guard in contract would fail for similar reasons. See Pls.' Resp. at 26. The record makes it clear that the Guard deliberately separated the program function overseen by LTG Ingram (recruitment and retention) from the contracting function. LTG Ingram and other senior leadership approved projects and provided direction regarding what services should be secured, Boettcher Dep. at 16:10–20, but their views were presented to the CO as "a request" that the CO exercise her authority to obligate the Guard to pay for the services, Rodriguez Dep. at 107:1–5. Only the CO had the authority to bind the government in contract. Rodriguez Dep. at 107:6–8. There is therefore no basis for finding that the authority to contract was an "integral function" of LTG Ingram's official duties.

There is similarly no merit to Panther's argument that "[b]y consenting to Gen. Ingram's ongoing direct communication [with] Panther, the authorized command structure of [the Army National Guard] Contracting [division] delegated contracting authority with respect to Panther to Gen. Ingram." Pls.' Resp. at 13. For one thing, the record does not show that LTG Ingram's communications with Panther were approved by the CO or any other officials with contracting authority. And the Court is unaware of any precedent that supports the proposition that a government official can acquire the authority to obligate the government in contract by acquiescence, much less by silence, before an agreement is made—and Panther cites none.

## 2.    Ratification

Panther also argues that even if Sgt. Kosa did not have the authority to contract on behalf of the government in the first instance, his actions were subsequently ratified by the CO. See Pls.' Resp. at 22. But Panther offers no evidence that would be sufficient to establish such ratification.

It is well established that "[a]greements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts." Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998) (citing United States v.

Beebe, 180 U.S. 343, 354 (1901)). But a claim that a principal has ratified the unauthorized act of his agent "can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken." Beebe, 180 U.S. at 354; see also Schism v. United States, 316 F.3d 1259, 1294 (Fed. Cir. 2002) (citing Beebe, 180 U.S. at 354) ("[F]ull . . . knowledge or awareness of the conduct being ratified is necessary for ratification."); Dolmatch Group, Ltd. v. United States, 40 Fed. Cl. 431, 438 (1998) ("[R]atification can only occur where the person ratifying the agreement has knowledge of the material facts pertaining to the agreement."); Garza v. United States, 34 Fed. Cl. 1, 21 (1995) ("[F]or a superior official to ratify a contract, that official must have full knowledge of all the details of the matter upon which the unauthorized action was taken.").

In addition, the ratifying official who has full knowledge of the underlying facts must also "demonstrate[] acceptance of the contract." Harbert/Lummus, 142 F.3d at 1434; Henke v. United States, 43 Fed. Cl. 15, 27 (1999) ("Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing."). In that regard, silence by the authorized official "in and of itself is not sufficient to establish a demonstrated acceptance of the contract." Harbert/Lummus, 142 F.3d at 1434.

For Panther to establish ratification here, it would need to show that either Maj. Rodriguez or another Guard official with contracting authority had actual or constructive knowledge that Sgt. Kosa had told Panther that its sponsorship agreement was being renewed and that it should begin the work it needed to perform in anticipation of the 2014 season. The ratifying official must also have known that the work had, in fact, begun and that Panther expected payment for it. And, in addition to evidence that the ratifying official knew the details of the alleged agreement, there must also be evidence beyond the ratifying official's silence to show that she approved the commitment that had been made.

Here, there is no evidence in the record from which a reasonable factfinder might infer that the CO or others with contracting authority had full knowledge regarding Sgt. Kosa's communications with Panther or that she acquiesced in any commitments he made. As described above, it appears that oral renewals of Panther's sponsorship agreements by Guard officials had occurred on a regular basis during past racing seasons. It further appears that the CO, Maj. Rodriguez, was aware that unauthorized commitments had been made in the past with respect to a number of other matters in the Division of Recruitment and Retention. In addition, the fact that Panther and Guard officials were engaged in communication was known by a number of individuals and was a cause for some concern. But there is no evidence, direct or otherwise, that Maj. Rodriguez or any other official with contracting authority had knowledge about statements that Sgt. Kosa made to Panther officials regarding its status for the 2014 racing season, much less that Panther had started preparing to participate in the 2014 season at his direction. Indeed, Maj. Rodriguez expressly stated in a sworn declaration that she did not know that Panther had been given any go-ahead for the 2014 season. Pls.' App. at 64 ("[I]t would not be unusual if [the GSS Division] told Panther to proceed [because] they had done it with other programs [but] I do not have any knowledge that they did.") (emphasis supplied). And Guard policies set forth a specific process governing how a CO may ratify unauthorized commitments made by a COR. Id. at 59 (excerpt from COR Handbook). The Federal Acquisition Regulations and Army Federal Acquisition Regulation Supplement ("AFARS") also contains rules governing the ratification of unauthorized commitments. 48 C.F.R. § 1.602-3; AFARS § 5101.602-3-90. Those regulations

and policies were not followed here. Harbert/Lummus, 142 F.3d at 1433 ("[A]gency procedures must be followed before a binding contract can be formed."); Doe v. United States, 58 Fed. Cl. 479, 488 (2003) (quoting Harbert/Lummus, 142 F.3d at 1433) (explaining that institutional ratification cannot occur where agency procedures are not followed).

In short, Panther has failed to submit evidence from which a reasonable trier of fact might determine: 1) that Sgt. Kosa and LTG Ingram possessed the authority to bind the government in contract, or 2) that individuals with contracting authority ratified a 2014 sponsorship agreement. For the reasons set forth above, Count IV of the complaint fails as a matter of law. Therefore, the government is entitled to summary judgment as to Counts I, IV, and V of the complaint.

## IV.    Alleged Implied-in-Fact Contract for Jobs Programs

In Count II of its complaint, Panther alleges that an implied-in-fact contract was formed between itself and the government whereby Panther would expand the activities undertaken in connection with its Boss Lift jobs program in 2013 to include the events and expenditures for which it seeks reimbursement in this case. The Court agrees with the government that Panther has failed to produce facts sufficient to establish the existence of an implied-in-fact agreement for an expanded jobs program.

First, Panther's allegations regarding the terms of the supposed implied-in-fact agreement concerning an expanded jobs program are vague at best. In his affidavit, Mr. Barnes states that at a January 30, 2013 meeting, "[t]he Guard urged Panther to find additional ways of expanding existing Panther programs and creating additional job-focused retention programs for [t]he Guard." Barnes Aff. ¶ 11. But he provides no specificity regarding what the parties allegedly agreed Panther would be obligated to do in connection with this expansion. And in his deposition, he was unable to identify any specific deliverables under the agreement allegedly reached. See Barnes Dep. at 307:18–308:13 (identifying "deliverable" as "increase[ing] retention within the National Guard" as reflected in an email to him); Id. at 309:14–18 ("deliverable" was "[t]o use our expertise in bringing area corporate members of the community to [a] race event"). Nor was there apparently any agreement about how much Panther would be paid for its efforts, although Mr. Barnes did testify generally that "we expected to be paid" for the new retention initiatives. Id. at 171. As such, Panther has produced no facts to show a mutual intent to contract that is unambiguous in offer and acceptance. See Crewzers Fire Crew Transp., Inc. v. United States, 741 F.3d 1380, 1382 (Fed. Cir. 2014) (quoting Ace-Fed. Reporters, Inc. v. Barram, 226 F.3d 1329, 1332 (Fed. Cir. 2002)) ("To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to provide a basis for determining the existence of a breach and for giving an appropriate remedy."); Aviation Contractor Emps., Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) ("The requirement for certainty in contracts serves . . . the need to determine whether the parties in fact intended to contract at all.").

Further, the fact that the Guard was modifying the Statement of Work between itself and LM&O to include the Boss Lift program at the same time it was allegedly entering this separate agreement with Panther, compounds the ambiguity regarding the terms of the alleged implied-in-fact agreement. The modified Statement provides that "the contractor [LM&O] shall utilize its racing partner's BOSS Lift program to achieve the [Guard's] retention initiatives goals." Def.'s

App. at 85. The Statement required LM&O to provide the Guard with a "BOSS Lift program plan" that included a schedule of events which does not include the events that are allegedly the subject of the implied-in-fact contract. See id. at 85–86; id. at 76–77 (list of proposed Boss Lift events dated June 10, 2013). The Statement as modified also provided that the events would be conducted in locations negotiated and approved by the government, and that all elements of any plan would have to be approved by the COR, Sgt. Kosa. Id. at 86.

According to Panther, it did in fact receive payment for the schedule of job programs set forth in the Statement. Pls.' Resp. at 6. The claims it pursues here therefore involve additional events and activities Panther undertook without written authorization but supposedly at the direction of Guard officials. But there is no evidence in the record that Panther was directed or asked to supply any specific services beyond those for which it has already been compensated. To the contrary, in a signed statement, Sgt. Kosa asserts that he "d[id] not know with specificity [] the breakdown for additional expenditures that Panther undertook, items such as increasing a research and development budget, hiring a new engineer, extra space at fan zone, more employee programs, extra tickets, etc." Pls.' App. at 68. He observed that the programs for which Panther seeks reimbursement here "were not specified in the contract" and that "[t]his was the company's decision to enhance their image that was on them." Id. at 69. He asserted further that "[w]e never told vendors that you can add cost if you do something and we would pay for it. That never happened." Id.

Panther's exhibits do not present evidence to support mutual intent to contract; nor do they clarify the terms of the alleged implied-in-fact agreement for additional jobs programs. In fact, its arguments in opposition to the government's motion for summary judgment with respect to Count II are unfocused, which reinforces for the Court the fatally ambiguous nature of the terms of the alleged implied-in-fact contract. Its brief consists largely of an extended discussion of the manner in which its jobs programs were funded in prior years as well as citations to documents, whose relevance is unexplained.[9]

Finally, Panther's implied-in-fact jobs program claim also fails because Panther again does not provide evidence that anyone with whom it allegedly spoke about expanding its Boss Lift program, whether Sgt. Kosa or LTG Ingram, had contracting authority. The CO, for her part, testified that she "didn't realize that Panther was performing any jobs programs" beyond those

---

[9] For example, Panther cites a document dated March 26, 2013 which is entitled "IRL – Questions for Program Managers." Pls.' Resp. at 39 (citing Pls.' App. at 74–84). But this document merely states vaguely that "[f]urther initiatives in 2013 will expand upon the retention of the boss lift component." Pls.' App. at 79. Panther next points to a document entitled "Motorsports Update," which describes several jobs programs that it conducted in 2012. Pls.' Resp. at 39 (citing Pls.' App. at 87–91). The remaining documents also appear immaterial to the issue of mutuality of intent to contract regarding an expanded jobs program in 2013. See Pls.' App. at 92–101 (powerpoint presentation dated March 5, 2013 containing talking points for the Boss Lift program); id. at 102–04 (email exchange dated February 8, 2013 discussing logistics for a Boss Lift event in Arizona); id. at 105–08 (email exchange discussing delay in funding for "the boss lift mod for the IRL contract").

for which LM&O was responsible. Rodriguez Dep. at 199:7–10; id. at 198:9–12.[10] There is therefore no factual basis for Panther to claim that any implied-in-fact contract regarding a jobs program was ratified by the CO as alleged in Counts III and V of the complaint.

In short, Panther has failed to provide factual support for its claim of an implied-in-fact contract for an expanded jobs program that encompassed the events for which Panther seeks reimbursement in this case. As such, the government is entitled to summary judgment as to Count II of Panther's complaint.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[10] In its opposition, Panther also argues that "[an] obligation to pay can be created by the [g]overnment if it allows an operation to continue and accepts the benefits from it." Pls.' Resp. at 23 (citing Janowsky v. United States, 133 F.3d 888 (Fed. Cir. 1998)). Even assuming the Guard benefited from the job initiatives for which Panther contends it was not paid, such "institutional ratification" of an implied-in-fact contract still requires a promise by an official empowered to bind the government to pay for the services received. See City of El Centro v. United States, 922 F.2d 816, 821 (Fed. Cir. 1990) (finding no institutional ratification when there was "no express promise, by an official empowered to bind the Government to pay for the care rendered . . . [and no] individual with contracting authority exercised that authority to bind the United States in this matter"). There is nothing in the record that evinces such a promise or commitment.